SEALED BY ORDER OF THE COURT

1

2

3          **UNITED STATES DISTRICT COURT**

4          **NORTHERN DISTRICT OF CALIFORNIA**

5          **SAN JOSE DIVISION**

6

7    JANE DOE 1, et al.,                              Case No.  18-cv-02349-BLF

8                    Plaintiffs,

9            v.                                        **ORDER GRANTING IN PART AND
                                                       DENYING IN PART DEFENDANTS'
                                                       MOTION TO DISMISS**
10   ALEJANDRO MAYORKAS, et al.,[1]

11                  Defendants.                        [Re:  ECF 397]

12

13          In the fall of 2016, a group of Iranian refugees was granted the right to travel to Austria as

14   the first step to achieving refugee resettlement in the United States. They were expecting to spend

15   a short time in Vienna before joining family members in the United States, just like approximately

16   30,000 other Iranian refugees before them in the Lautenberg-Specter Program. Unfortunately, the

17   majority of this group is still in Austria today. This class-action lawsuit on behalf of both stranded

18   refugees and their U.S.-based family sponsors challenges changes in the refugee vetting process

19   policy that have left the refugees stranded in Austria.

20          Before the Court is Defendants' motion to dismiss Plaintiffs'[2] last active claim in this

21   matter, which is brought under the Administrative Procedure Act ("APA"). *See* Mot., ECF 397.

22   Defendants argue that Plaintiffs lack Article III standing, this Court lacks subject-matter

23   jurisdiction, and Plaintiffs have failed to state a claim. Mot. 1. Plaintiffs oppose this motion and

24   argue they were denied the opportunity to be processed under a lawful vetting scheme. *See* Opp'n,

25

26   [1] This suit was originally brought against then-Secretary Kirstjen Nielson, and Secretary
     Mayorkas, as the current Secretary of Homeland Security, is her automatic substitute. "An action
27   does not abate when a public officer who is a party in an official capacity dies, resigns, or
     otherwise ceases to hold office while the action is pending. The officer's successor is
     automatically substituted as a party." Fed. R. Civ. P. 25(d).
28   [2] The Court previously granted Plaintiffs' unopposed motion to proceed under pseudonyms. See
     Order, ECF 55.

United States District Court
Northern District of California

ECF 407-4. After considering the briefing and the parties' oral arguments, this motion is GRANTED IN PART and DENIED IN PART.

## I.   BACKGROUND

The Court will begin with a brief overview of the law governing the admission of Iranian refugees to the United States.

### A.   Lautenberg-Specter Program

The admission of refugees into the United States is authorized by 8 U.S.C. § 1157. Am. Compl. ("FAC") ¶ 62, ECF 383-4. In 1989, Congress enacted the Lautenberg Amendment to facilitate the admission of certain categories of persecuted individuals. Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1990, Pub. L. No. 101–167, sec. 599D, 103 Stat. 1195 (1989). The Lautenberg Amendment lowers the evidentiary burden for eligibility for refugee admissions, as it permits specified groups of applicants to demonstrate a well-founded fear of persecution by establishing membership in the group and asserting "a credible basis for concern about the possibility of such persecution." *Id.*(a). Additionally, each decision to deny an application from a noncitizen covered by this amendment "shall be in writing and shall state, to the maximum extent feasible, the reason for the denial." *Id.*(c). Statements by Senator Frank Lautenberg and the Immigration Subcommittee indicate that the amendment intended to limit the exercise of discretion to deny applicants to "isolated" and "extremely limited cases." FAC ¶ 29; 135 Cong. Rec. 21109 (1989).

In 2004, Congress passed the Specter Amendment, which added Iranian religious minorities to the categories of people eligible for the special protections of the Lautenberg Amendment. Consolidated Appropriations Act, 2004, Pub. L. 108-199, Division E, Title II, sec. 213, §599(D), 118 Stat. 3. Congress has reauthorized the Lautenberg and Specter Amendments regularly, including in the 2019 Consolidated Appropriations Act. Pub. L. 116-6, sec. 7034(m)(5), 133 Stat. 13. The United States has long recognized that Iran engages in severe violations of religious freedom against the one percent of the population that does not identify as Muslim. FAC ¶¶ 32-33.

Refugee applications are generally processed at a U.S. Department of State facility, such as

2

United States District Court
Northern District of California

an embassy, but the United States does not have an embassy in Iran. FAC ¶ 35. As a result, the Iranian religious minorities applying for refugee status do so through the Vienna, Austria-based Lautenberg-Specter Program. *Id.* The application process begins with a U.S.-based person who has lawful status in the United States ("U.S. Tie")—usually a close family member—submitting an application on behalf of refugee applicants in Iran. *Id.* ¶ 36. The application is processed by HIAS, a U.S.-based nonprofit that has an agreement with the U.S. State Department to operate a resettlement support center in Vienna. *Id.* ¶ 36. Initiating an application requires a substantial commitment on the part of the U.S. Tie: $3,000 per single applicant or $2,600 per applicant on a case for a family of two or more, plus a $330 non-refundable administrative fee per case and pledge to cover any liabilities during processing in Vienna. *Id.* ¶ 37. Once HIAS receives the application and deposits, and the refugee applicant passes an initial screening process, the Austrian government issues a visa to the refugee at the request of the U.S. government, permitting travel to Austria for the sole purpose of continued processing for the Lautenberg-Specter Program. *Id.* ¶ 38. The refugee applicants are responsible for the cost of their travel, and most of them sell their belongings and prepare to restart their lives in the United States. *Id.*

Once in Austria, HIAS assists the refugee applicants in preparing additional application materials before United States Citizenship and Immigration Services ("USCIS") officers interview them. FAC ¶ 40. Refugee applicants also undergo medical screening, attend cultural orientation, and obtain an assurance of sponsorship from a resettlement agency in the United States that has agreed to assist with their resettlement. *Id.* Refugee applicants are only admitted to the United States after the U.S. government has completed this final vetting. *Id.* ¶ 41. Both HIAS and the U.S. State Department have reported that Lautenberg-Specter applicants in the Program prior to the fall of 2016 typically stayed in Austria for a few months before nearly 100 percent of them were approved for admission into the United States. *Id.* ¶ 42.

### B.    Changes to Vetting Procedures

In late 2015, Defendants Department of Homeland Security (DHS) and Department of State ("DOS") approved the transfer of the Security Advisory Opinion ("SAO") vetting process for refugees to the Federal Bureau of Investigation's Foreign Terrorist Threat Task Force ("FBI

United States District Court
Northern District of California

Terrorist Task Force"). FAC ¶ 4. The FBI Terrorist Task Force vetting began on January 1, 2016. *Id.* ¶ 71.  Plaintiffs allege that this change was a final agency action that had direct consequences for Plaintiffs. *Id.* ¶ 59.

Plaintiffs allege that ████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████ The FBI Terrorist Task Force adopted a "zero risk tolerance" threshold and issued a SAO "not clear" result, labeling the case a security threat, whenever it found ████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████

      █████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ ██

████████████████████████████████████████████████████████████

---

[3] SAO Merlin vetting applies to all refugee applicants of most ages from Iran, Iraq, Somalia, Sudan, South Sudan, Syria, Yemen, Egypt, Libya, Mali, and North Korea. FAC ¶ 64.

1

2
                                                                                    *Id.* ¶ 90.

3          This change in the SAO Merlin vetting process caused the percentage of "not clear" results

4   to increase by as much as ████████. FAC ¶ 7. For example, the Pentagon raised alarm about

5   the increase in Iraqi refugees who were receiving SAO "not clear" results given that many of them

6   had helped American military troops in battle—of the eighty-eight Iraqi refugees vetted under

7   SAO checks during a certain time after vetting had been transferred to the FBI Terrorist Task

8   Force, eighty-seven refugees, or nearly ninety-nine percent, received "not clear" results. *Id.* In the

9   Vienna Lautenberg-Specter Program, prior to September 2016, no Iranian refugee applicant who

10  had reached Vienna had received a "not clear" vetting result. *Id.* ¶ 97. In fiscal year 2016, just one

11  person, or 0.2% of the group that reached Vienna, received a "not clear" SAO result. *Id.* In fiscal

12  year 2017, the percentage increased one hundred times to twenty percent receiving "not clear"

13  results. *Id.*

14          By the end of 2016, refugee applicants in the Vienna Lautenberg-Specter Program began to

15  experience longer wait times in Vienna. FAC ¶¶ 43-44. On or around February 19, 2018, DHS

16  issued denials to approximately eighty-three of the one hundred Iranian Lautenberg-Specter

17  applicants who were in Vienna with pending applications. *Id.* ¶ 50. The identical Notices of

18  Ineligibility indicated that the applications had been denied "as a matter of discretion" and did not

19  provide any further reasoning, despite the Lautenberg Amendment's requirement that any denial

20  "shall be in writing and shall state, to the maximum extent feasible, the reason for the denial." *Id.*

21  ¶¶ 52-53. The USCIS policy manual on discretion, dated November 2015 and supplemented in

22  April 2018, also mandates that absent any negative factors, discretion must be exercised

23  positively. *Id.* ¶ 54. When discretion is exercised negatively, the "decision must contain a

24  complete analysis of the factors considered in exercising discretion, with a specific and cogent

25  explanation of why you exercised discretion negatively." *Id.* The Notices of Ineligibility also

26  informed the Vienna Lautenberg-Specter refugee applicants that they had ninety days from the

27  date of the notice to submit a Request for Review ("RFR") of their application. *Id.* Applicants

28  were instructed to set forth in the RFR: "(1) a detailed account explaining how a significant error

5

1    was made by the adjudicating officer, or (2) new information that would merit a change in the

2    determination." *Id.* ¶ 57. USCIS allegedly has previously reported that RFRs are frequently

3    determined in favor of the applicant. *Id.* ¶ 58. Since these Notices of Ineligibility did not include

4    any information on why the refugee applications were denied, though, they did not provide the

5    refugee applicants with any information with which they could meaningfully pursue an RFR. *Id.*

6        Plaintiffs allege that a "not clear" SAO vetting result is outcome determinative for refugee

7    applicants. FAC ¶ 100. According to Plaintiffs, a "not clear" result causes DHS to deny cases in

8    which it has already interviewed the applicant, and DOS administratively closes cases that receive

9    a "not clear" result prior to a DHS interview. *Id.* Plaintiffs allege that the decision of Defendants

10   DHS and DOS to adopt the policy and practice of denying or rejecting refugee cases based on a

11   "not clear" result also constitutes a final agency action that had direct consequences for Plaintiffs.

12   *Id.* ¶¶ 177-78. This decision, along with the decision to transfer vetting to the FBI Terrorist Task

13   Force, represent the consummation of the agency decision-making process and had the

14   consequence of resulting in denials or rejections for refugee applications, according to Plaintiffs.

15   *Id.* ¶ 177. These changes, according to Plaintiffs, reflect one or more substantive rules because

16   they substantively change the eligibility criteria for refugee admissions. *Id.* ¶ 179.

17       **C.    Procedural History**

18       This case began on April 18, 2018, when Plaintiffs filed suit against the DHS, DOS, the

19   then-Secretary of Homeland Security, the then-Acting Secretary of State, the then-Director of U.S.

20   Citizenship and Immigration Services, and the then-Associate Director of U.S. Citizenship and

21   Immigration Services for Refugee, Asylum, and International Operations Directorate. Compl.,

22   ECF 1. On April 20, 2018, Plaintiffs filed a motion for class certification, *see* Mot., ECF 20,[4] and

23   for partial summary judgment, *see* Mot., ECF 25. The Court granted both motions on July 10,

24   2018. *See* Order ("MSJ Order"), ECF 87. The partial summary judgment order disposed of claims

25   one through five, which challenged the adequacy of the explanation provided in the notices

26   denying class members' refugee applications. Opp'n 2-3. As a result of this Court's order, DHS

27   _____

28   [4] Plaintiffs later filed an amended motion for class certification on May 18, 2018. *See* Amend.
     Mot., ECF 60.

United States District Court
Northern District of California

1   re-opened the cases of all Iranian refugee applicants in Vienna who had received the deficient

2   Notices of Ineligibility. FAC ¶ 106. DHS admitted sixteen refugee applicant class members to the

3   United States who previously had been issued the deficient Notices of Ineligibility, including

4   Plaintiffs Doe 3 and 4. *Id.* ¶ 107. The remainder of the refugee applicant class members received

5   Security-Related Notices of Ineligibility, informing them that their applications were being denied

6   as a matter of discretion due to "National security-related reasons based on classified information

7   that is material to the decision." *Id.* ¶ 108.

8        This motion to dismiss Plaintiffs' last remaining claim, claim six, was originally filed on

9   August 14, 2018. ECF 96. On September 7, 2018, Magistrate Judge Virginia K. DeMarchi, who

10  presides over discovery disputes in this matter, ordered jurisdictional discovery regarding the

11  nature of the agency action. Order ("Jurisdictional Discovery Order") 3-4, ECF 102. Defendants

12  withdrew their motion to dismiss on October 22, 2018, and agreed to refile after the conclusion of

13  the jurisdictional discovery period. *See* Order, ECF 121. Jurisdictional discovery was expected to

14  take two months. Jurisdictional Discovery Order 4. It took nearly two years, thanks in part to

15  discovery abuses on the part of Defendants. *See* Order, ECF 218; Order, ECF 261 (sanctioning

16  Defendants and awarding Plaintiffs $41,546.52 in attorneys' fees and costs).

17       On June 16, 2020, the Court granted Plaintiffs' request in part to file an amended

18  complaint. See Order, ECF 357; Am. Order, ECF 389. Plaintiffs filed their amended complaint on

19  July 2, 2020. *See* FAC. The only remaining claim, claim six, is brought by Plaintiffs Doe 6, 7 and

20  8, including the Amended Claim Six Class. Plaintiff Jane Doe 6 is an Iranian citizen currently

21  located in Vienna, Austria, who applied for refugee status with her husband and their young

22  daughter through the Vienna Lautenberg-Specter Program. FAC ¶ 16. Plaintiff John Doe 7 served

23  as the U.S. Tie for the refugee application of his aunt, her husband, and their four children. *Id.* ¶

24  17. Plaintiff Jane Doe 8 served as the U.S. Tie for the refugee application of her nephew. *Id.* ¶ 18.

25       Claim six alleges a violation of the APA based on the decision by Defendants to allow the

26  FBI Terrorist Task Force to use its ███████████████████████████ in SAO

27  Merlin vetting and DHS and DOS's decisions to adopt the policy and practice of denying or

28  rejecting refugee cases based on a "not clear" result from the FBI's SAO Merlin vetting. FAC ¶

United States District Court
Northern District of California

177. According to Plaintiffs, these changes constitute final agency actions and substantive rules, and Defendants did not follow rulemaking procedures for any of the changes. *Id.* ¶¶ 178-79. Plaintiffs allege these Defendants' changes were unlawful because they were arbitrary, capricious, an abuse of discretion, or not in accordance with law. *Id.* ¶ 183. Plaintiffs further argue the changes were unlawful because the agency actions did not follow notice-and-comment procedures *Id.* ¶ 183.

Defendants filed this motion to dismiss on July 16, 2020. *See* Mot.

## II.    LEGAL STANDARD

### A.    Federal Rule of Civil Procedure 12(b)(1)

A party may challenge the Court's subject matter jurisdiction by bringing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1). "A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air For Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In a facial attack, the movant asserts that the lack of subject matter jurisdiction is apparent from the face of the complaint. *Id.* In a factual attack, the movant disputes the truth of allegations that otherwise would give rise to federal jurisdiction. *Id.* "In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Id.* "The court need not presume the truthfulness of the plaintiff's allegations." *Id.* Once the moving party has presented evidence demonstrating the lack of subject matter jurisdiction, the party opposing the motion must present affidavits or other evidence sufficient to establish subject matter jurisdiction. *Id.* "However, in the absence of a full-fledged evidentiary hearing, disputes in the facts pertinent to subject-matter are viewed in the light most favorable to the opposing party." *In re Facebook Privacy Litig.*, 791 F. Supp. 2d 705, 710 (N.D. Cal. 2011), *aff'd*, 572 F. App'x 494 (9th Cir. 2014) (citing *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir.1996)). "The disputed facts related to subject-matter jurisdiction should be treated in the same way as one would adjudicate a motion for summary judgment." *In re Facebook Privacy Litig.*, 791 F. Supp. 2d at 710 (citing *Dreier*, 106 F.3d at 847).

### B.    Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss, a complaint must contain sufficient factual matter,

8

1    accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S.

2    662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When

3    considering such a motion, the Court "accept[s] factual allegations in the complaint as true and

4    construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St.*

5    *Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). When evaluating a Rule

6    12(b)(6) motion, the district court must consider the allegations of the complaint, documents

7    incorporated into the complaint by reference, and matters which are subject to judicial notice.

8    *Louisiana Mun. Police Employees' Ret. Sys. v. Wynn*, 829 F.3d 1048, 1063 (9th Cir. 2016) (citing

9    *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

10   ### III.    DISCUSSION

11           Defendants argue that Plaintiffs' complaint must be dismissed because Plaintiffs lack

12   Article III standing, the APA claim is not reviewable by this Court and, if the Court disagrees, the

13   APA claim still must be dismissed because the changes were merely general statements of policy

14   and did not require notice-and-comment rulemaking. Mot. 2-3. The Court will discuss each

15   argument in turn.

16           #### A.    Plaintiffs Have Standing

17           Defendants argue that Plaintiffs lack Article III standing because they cannot establish

18   causation or that any relief from this Court would redress their alleged injuries. Mot. 7-10.

19   Defendants argue that Plaintiffs are not eligible for refugee resettlement in the United States

20   because Jane Doe 6 and the sponsored family members of Does 7 and 8 have received asylum in

21   Austria. Mot. 9-10.

22           Plaintiffs argue that Defendants misrepresent their claimed injury—the lost opportunity to

23   have their applications (and the applications of their family members) examined under a lawful

24   process—and that this injury is directly linked to the Defendants' change in vetting policies.

25   Opp'n 6-7. Plaintiffs further argue that the relief they request—declaratory judgment and vacatur

26   of the unlawful program changes and any actions that relied on such changes—will redress their

27   injuries. Opp'n 7-8. And Plaintiffs argue that the firm resettlement bar does not apply to them

28   because they only entered Austria at the direction of the United State to complete refugee

United States District Court
Northern District of California

1   processing, and, moreover, Austrian asylum is not a permanent status and only provides a limited

2   resident permit for three years. *Id.* 8-10.

3          This Court agrees with Plaintiffs that they have established Article III standing. This "is a

4   necessary component of subject matter jurisdiction." *In re Palmdale Hills Prop., LLC*, 654 F.3d

5   868, 873 (9th Cir. 2011). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly

6   traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a

7   favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). These elements

8   are often referred to as injury in fact, causation, and redressability. *See*, *e.g.*, *Planned Parenthood*

9   *of Greater Washington & N. Idaho v. U.S. Dep't of Health & Human Servs.*, 946 F.3d 1100, 1108

10  (9th Cir. 2020). "In a class action, this standing inquiry focuses on the class representatives." *NEI*

11  *Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.*, 926 F.3d 528, 532 (9th Cir.

12  2019). If none of the named plaintiffs purporting to represent a class can establish standing to sue,

13  the class action cannot proceed. *Id.* (citing *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)).

14  Defendants do not challenge the fact that Plaintiffs have suffered an injury in fact. Mot. 8.

15              **i.    Causation**

16         The Court agrees with Plaintiffs that Defendants mischaracterize the injury they claim. The

17  claimed injury is not the denial of their individual refugee admissions, Mot. 8, or a refugee

18  determination divorced from FBI Terrorist Task Force involvement, Reply 3, ECF 415. The

19  claimed injury is the "lost opportunity to have their and their sponsored relatives' refugee

20  applications examined under a lawful *process*, regardless of the *outcome* of the process and

21  notwithstanding that fact that the ultimate decision is discretionary." Opp'n 6. (emphasis in

22  original). The Ninth Circuit has long held that a lost opportunity to pursue an immigrant visa is a

23  cognizable Article III injury. *Abboud v. I.N.S.*, 140 F.3d 843, 847 (9th Cir. 1998). Here, the Court

24  easily finds that Plaintiffs' lost opportunity for a fair vetting process is fairly traceable to the

25  changes in vetting process. Additionally, Plaintiffs have alleged that, but-for the change in vetting

26  process, they would have likely been admitted under the pre-2016 vetting scheme, just like the

27  ninety-nine percent of individuals who had passed the initial vetting in Iran and been invited to

28  Vienna and subsequently were admitted to the United States prior to the change. Opp'n 7 n.1. The

1    Court finds that this, too, supports Plaintiffs' causation argument.

2           ii.    **Redressability**

3           Defendants have two arguments regarding the Court's ability to redress Plaintiffs' alleged

4    injuries with a favorable decision: Plaintiffs don't ask the Court to re-open or re-adjudicate their

5    denials, so a ruling in their favor could not provide relief, and, irrespective of any ruling from this

6    Court, Plaintiffs are ineligible to receive refugee status in the United States because of the firm

7    resettlement bar. Mot. 9-10 The first argument is easily dispatched: Plaintiffs ask this Court to set

8    aside any subsequent actions that relied on the unlawful program changes, which this Court

9    interprets as a request to set aside the denial of Plaintiffs' applications. *See Regents of the Univ. of*

10   *California v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 511 (9th Cir. 2018) ("[w]hen a

11   reviewing court determines that agency regulations are unlawful, the ordinary result is that the

12   rules are vacated") (quoting *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399,

13   1409 (D.C. Cir. 1998)), *rev'd on other grounds Dep't of Homeland Sec. v. Regents of the Univ. of*

14   *California*, 140 S. Ct. 1891 (2020)). The analysis of the firm resettlement bar is more nuanced.

15          "Any applicant…who has become firmly resettled in a foreign country is not eligible for

16   refugee status." 8 C.F.R. § 207.1(b). "A refugee is considered to be 'firmly resettled' if he or she

17   has been offered resident status, citizenship, or some other type of permanent resettlement by a

18   country other than the United States and has traveled to and entered that country as a consequence

19   of his or her flight from persecution." *Id.* "Any applicant who claims not to be firmly resettled in a

20   foreign country must establish that the conditions of his or her residence in that country are so

21   restrictive as to deny resettlement." *Id.*

22          Determining whether the firm resettlement bar applies is a two-step process: "First, the

23   government presents 'evidence of an offer of some type of permanent resettlement.'" *E. Bay*

24   *Sanctuary Covenant v. Barr*, 385 F. Supp. 3d 922, 942 (N.D. Cal. 2019), *aff'd*, 964 F.3d 832 (9th

25   Cir. 2020) (quoting *Arrey v. Barr*, 916 F.3d 1149, 1159 (9th Cir. 2019)). If the government

26   presents this evidence, then the burden shifts to Plaintiffs to show that the nature of their stay and

27   ties were too tenuous, or the conditions of their residence too restricted, for them to be firmly

28   resettled. *E. Bay Sanctuary*, 385 F. Supp. 3d at 942 (quoting *Arrey*, 916 F.3d at 1159). Here,

1    Defendants point to Plaintiffs' complaint, which indicates that Jane Doe 6, and the family

2    members of Doe 7 and 8, have received asylum on Austria. FAC ¶¶ 133, 145, 152. Accordingly,

3    the burden shifts to Plaintiffs.

4        Plaintiffs argue that the firm resettlement bar does not apply to Plaintiffs under

5    Defendants' own policies. Opp'n 8; Ex. 1, USCIS RAIO Directorate Officer Training Module

6    ("Training Module") 10, ECF 408-2 (explaining that firm resettlement bar only applies to refugees

7    if they enter a country other than the United States *as a consequence of flight* and receive

8    permanent status) (emphasis added). The Training Module makes clear that firm resettlement is

9    "the ability to stay in a country *indefinitely*." Training Module 15 (emphasis in original) (quoting

10   *Matter of A-G-G-*, 25 I. & N. Dec. 486, 501 (BIA 2011)). This Court has previously determined

11   that Defendants are bound by their own policies, including those found in manuals. MSJ Order 30-

12   32. Accordingly, the Court finds DHS bound by this policy.

13       The Court agrees with Plaintiffs that the firm resettlement bar does not apply to them for

14   two separate reasons: Plaintiffs do not have permanent status in Austria, and Plaintiffs did not

15   enter Austria as a "consequence of flight." Plaintiffs have presented evidence that a grant of

16   asylum in Austria provides a "limited resident permit for three years." *Asylum, subsidiary*

17   *protection and right to remain*, Das österreichische Asylverfahren einfach erklärt http://www.asyl-

18   faq.at/content/?lang=en#asylum_sub_prot_right_to_remain (last visited February 28, 2021). This

19   is not the ability to stay indefinitely that DHS's regulations and policies require. Additionally, the

20   Court considers the unique circumstances of this case: The U.S. government requires Iranian

21   refugees to enter Austria as a weigh station, or layover, prior to entering the United States. The

22   Court finds that Plaintiffs did not enter as a consequence of flight but rather as a consequence of

23   the United States's arrangement with the Austrian government under the Lautenberg-Specter

24   Program. For the foregoing reasons, the Court finds that the firm resettlement bar does not apply

25   to Plaintiffs, and Plaintiffs have adequately pled redressability.

26       In conclusion, Plaintiffs have established Article III standing.

27   **B.    The Challenged Vetting Policy Changes Are Reviewable Under the APA**

28       Defendants argue that both vetting policy changes Plaintiffs challenge—the decision to

transfer Merlin SAO vetting to the FBI Terrorist Task Force in order to apply its

███████████████████████████████ and the decision to adopt the policy and practice of

denying or rejecting refugee cases based on a "not clear" vetting result—are unreviewable under

the APA because those changes involve determinations committed to agency discretion. Mot. 10-

18. This Court disagrees.

As a threshold matter, the parties disagree over whether this question of reviewability

under the APA is a jurisdictional issue considered under a Rule 12(b)(1) motion or whether it is

properly evaluated as part of a Rule 12(b)(6) motion. Mot. 2-3; Reply 11; Opp'n 4. Plaintiffs cite

*Trump v. Hawaii*, 138 S. Ct. 2392, 2407 (2018), and *Allen v. Milas*, 896 F.3d 1094, 1102 (9th Cir.

2018). However, both cases dealt with the specific doctrine of consular nonreviewability, which

*Allen* analyzed under 5 U.S.C. 702, not Section 701(a)(2). The Ninth Circuit also implicitly

approved a district court treating a Section 701(a)(2) challenge as jurisdictional in *Perez v. Wolf*,

943 F.3d 853, 859-60 (9th Cir. 2019). Accordingly, the Court agrees with Defendants that this

argument is properly analyzed as part of their Rule 12(b)(1) motion.

The Court will analyze the two challenged changes separately, as Defendants make

different arguments for each change.

### i. The Decision to Transfer SAO Vetting to the FBI Terrorist Task Force in Order to Apply Certain Vetting Techniques

Defendants argue that the decision to transfer vetting to the FBI Terrorist Task Force is

unreviewable for several reasons. Mot. 12-14. First Defendants argue that Congress has granted

DHS broad authority to consult with law enforcement and intelligence agencies to conduct vetting

in order to enforce the Immigration and Nationality Act ("INA"), and this authority shields the

decision to transfer SAO vetting to the FBI Terrorist Task Force from judicial review. Mot. 12-13.

Second, Defendants cite several provisions of the INA—8 U.S.C. §§ 1103(a)(4), 1105(a),

1225(d)(3), 1357(b)—as evidence that Congress granted authority to Defendants to make this

decision free from judicial review. Mot. 13-14. And finally, Defendants argue that the decisional

process and decision itself are unreviewable under the arbitrary-and-capricious standard

articulated in 5 U.S.C. § 706 because the Court has no meaningful standard to judge Defendants'

United States District Court
Northern District of California

1    exercise of discretion. Mot. 14.

2    Plaintiffs argue that Defendants' arguments largely miss the point. Opp'n 11-17. This

3    Court agrees with respect to Defendants' arguments related to the authority to coordinate with law

4    enforcement and intelligence agencies and the cited provisions of the INA. Plaintiffs do not

5    challenge Defendants' ability to coordinate with law enforcement and security agencies and take

6    and consider evidence to conduct vetting, which is what each of the cited statutes empowers

7    Defendants to do. Rather, Plaintiffs challenge the change in the preexisting vetting procedure for

8    the refugee applications in the Vienna Lautenberg-Specter Program. Courts regularly evaluate

9    changes in agency policies and actions. *See., e.g.*, *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S.

10   502, 515 (2009) ("An agency may not ... depart from a prior policy *sub silentio* or simply

11   disregard rules that are still on the books.").

12   The Court considers Defendants' argument regarding a lack of meaningful standard to

13   measure discretion under the appropriate framework of the APA. "The Administrative Procedure

14   Act embodies a basic presumption of judicial review." *Dep't of Commerce v. New York*, 139 S. Ct.

15   2551, 2567 (2019) (internal quotations and citations omitted). An exception to this presumption is

16   5 U.S.C. § 701(a)(2), which exempts from review agency action that is "committed to agency

17   discretion by law." *Id.* "[W]e have read the § 701(a)(2) exception for action committed to agency

18   discretion quite narrowly, restricting it to those rare circumstances where the relevant statute is

19   drawn so that a court would have no meaningful standard against which to judge the agency's

20   exercise of discretion." *Id.* (internal quotations and citations omitted). The Section 701(a)(2)

21   exception has generally been limited to "certain categories of administrative decisions" *id.*, such as

22   a decision not to institute enforcement proceedings, *Heckler v. Chaney*, 470 U.S. 821, 831–832,

23   (1985), or a decision by an intelligence agency to terminate an employee in the interest of national

24   security, *Webster v. Doe*, 486 U.S. 592, 600–601 (1988).

25   "[T]he mere fact that a statute contains discretionary language does not make agency

26   action unreviewable." *Perez*, 943 F.3d at 862. The Ninth Circuit has found that the Section

27   701(a)(2) exception does not apply in several immigration-related APA cases. *See Perez*, 943 F.3d

28   at 863 (finding meaningful standards in the U visa statutory framework under which to review the

United States District Court
Northern District of California

exercise of USCIS's authority to issue U visas), *Gonzalez-Caraveo v. Sessions*, 882 F.3d 885, 893 (9th Cir. 2018) (holding that the factors enumerated in a precedential Board of Immigration Appeals decision provide a "sufficiently meaningful standard" by which to evaluate the denial of a request for administrative closure); *Taslimi v. Holder*, 590 F.3d 981, 986 (9th Cir. 2010) (holding that there is a meaningful standard by which to review whether a petitioner has filed for asylum within a "reasonable period" after changed circumstances because agency regulations "provide a non-exhaustive list of potential changed circumstances" and require the immigration judge to "consider an applicant's delayed awareness of changed circumstances"). The Court finds these cases more applicable to the present case than out-of-circuit cases cited by Defendants in which the D.C. Circuit held that courts were ill-equipped to second guess military-related decisions. *See Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n v. Mar. Admin.*, 215 F.3d 37, 41–42 (D.C. Cir. 2000), *Nat'l Fed'n of Fed. Employees v. United States*, 905 F.2d 400, 405-06 (D.C. Cir. 1990).[5]

Here, Plaintiffs point to the framework governing the Lautenberg-Specter Program as providing proper standards for the Court to use in reviewing the challenged action. Opp'n 13. Plaintiffs cite 8 U.S.C. § 1157,[6] which specifies categories of ineligible refugees, and 8 U.S.C. § 1182(a)(3), which further lists categories of ineligible noncitizens, including those ineligible under security-related grounds. Plaintiffs argue that none of the security-related concerns include being tenuously linked to an FBI investigation through ████████████████ Opp'n 13. Plaintiffs further cite the Lautenberg Amendment, which lowers the evidentiary burden normally required to receive refugee status, and the Congressional Record, which includes statements indicating that the discretion to deny cases arising under the Lautenberg Amendment is "extremely limited in scope." FAC ¶¶ 28, 29; Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1990, Pub. L. No. 101–167, sec. 599D, 103 Stat. 1195 (1989); 135 Cong. Rec. 21109 (1989). Finally, Plaintiffs cite a USCIS policy manual on discretion that

---

[5] Military functions are treated as a separate category under the APA. *See, e.g.*, 5 U.S.C. 553(a)(1).
[6] The statute 8 U.S.C. § 1157 also gives the Secretary discretion to admit or deny any individual refugee, and the Court has acknowledged several times throughout the litigation that Plaintiffs do not challenge this specific discretion.

United States District Court
Northern District of California

1    mandates that, absent any negative factors, discretion must be exercised positively. *Id.* ¶ 54. When

2    discretion is exercised negatively, the "decision must contain a complete analysis of the factors

3    considered in exercising discretion, with a specific and cogent explanation of why you exercised

4    discretion negatively." *Id.* The Ninth Circuit has held such materials are appropriate to consider

5    when establishing meaningful standards of review. *See Pinnacle Armor, Inc. v. United States*, 648

6    F.3d 708, 719 (9th Cir. 2011) (looking to "regulations, established agency policies, or judicial

7    decisions" for meaningful standards of review).

8        Cognizant of the historically "quite narrow" interpretation of the Section 701(a)(2)

9    exception, the Court finds that Plaintiffs have identified standards which allow a Court to review

10   Defendants' decision to transfer SAO vetting to the FBI Terrorist Task Force. The statutory

11   framework governing the Lautenberg-Specter Program, along with Defendants' previous vetting

12   policy and practices, provide those standards.[7] *See Lona v. Barr*, 958 F.3d 1225, 1236 (9th Cir.

13   2020) (noting that an agency's past practice is not irrelevant and an irrational departure from that

14   policy could constitute action that must be overturned as arbitrary, capricious, or an abuse of

15   discretion). As previously noted, Defendant USCIS has issued policy guidance on discretion, FAC

16   ¶ 54, and this policy manual adds further detail to the standards against which the Court could

17   review the challenged policy. These agency standards, along with the statutory framework of the

18   Lautenberg-Specter Program, "supply the standard against which we can judge the agency's

19   decision-making." *Pinnacle Armor*, 648 F.3d at 719.

20        "In determining whether judicial review is precluded by § 701(a)(2), 'we consider 'the

21   language of the statute and whether the general purposes of the statute would be endangered by

22   judicial review.'" *Perez Perez*, 943 F.3d at 856 (quoting *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059,

23   1068 (9th Cir. 2015). Here, the purpose of the Refugee Act of 1980, which amended the INA "to

24   establish a more uniform basis for the provision of assistance to refugees" is as follows:

25

26        The Congress declares that it is the historic policy of the United States to respond to the
         urgent needs of persons subject to persecution in their homelands, including, where

27

28   _____
     [7] The Court does agree with Defendants that the regulations cited by Plaintiffs, 8 C.F.R. § 207.1-9,
     do not contribute meaningful standards for review. Opp'n 16, Reply 11.

appropriate, humanitarian assistance for their care and maintenance in asylum areas, efforts to promote opportunities for resettlement or voluntary repatriation, aid for necessary transportation and processing, admission to this country of refugees of special humanitarian concern to the United States, and transitional assistance to refugees in the United States.

Pub. L. No. 96-212, sec. 101, 94 Stat. 102 (1980). The Court does not find that the purpose of the Refugee Act would be endangered by judicial review of Defendants' decision to transfer SAO vetting to the FBI Terrorist Task Force in order to apply certain vetting techniques.

### ii. The Decision to Adopt a Policy and Practice of Denying Refugee Applications Based on "Not Clear" Vetting Results

Defendants also argue that the second change challenged by Plaintiffs—the decision to adopt a policy and practice of denying refugee applications based on "not clear" vetting results—is unreviewable under the APA. Mot. 14-18. Defendants' primary challenge to this change focuses on Section 701(a)(1) and the jurisdiction-stripping provision of INA at 8 U.S.C. § 1252(a)(2)(B)(ii). Mot. 14-18. Defendants also argue that this change is unreviewable under Section 701(a)(2) because "there is no meaningful standard against which to evaluate USCIS's exercise of discretion in according the appropriate weight to the FBI vetting result in adjudicating the refugee applications at issue." Mot. 16-17. The Court addresses each argument in turn.

Section 701(a)(1) of the APA states that judicial review is not available under the APA "'to the extent that' a relevant statute precludes it." *Dep't of Commerce v. New York*, 139 S. Ct. at 2567 (quoting 5 U.S.C. 701(a)(1)). Defendants cite 8 U.S.C. § 1252(a)(2)(B)(ii), which states that denials of discretionary relief are matters not subject to judicial review. As Defendants acknowledge, *see* Reply 11 n.2, this Court has previously rejected this argument based on 8 U.S.C. § 1252(a)(2)(B)(ii) as it applies to the Plaintiffs' claims in this case. *See* MSJ Order 22-25.[8] As the Court wrote previously, while it is true that there is no judicial review for individual visa or refugee applications, this denial of judicial review "does not apply to challenges to immigration policies." Am. Order 7-8 (citing *Washington v. Trump*, 847 F.3d 1151, 1162-63 (9th Cir. 2017)

---

[8] "The law-of-the-case doctrine generally provides that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case," *Musacchio v. United States*, 136 S. Ct. 709, 716 (2016) (alteration and internal quotation marks omitted)

United States District Court
Northern District of California

United States District Court
Northern District of California

1  (recognizing "challeng[es] [to] the President's promulgation of sweeping immigration policy")).

2  Plaintiffs here challenge the change to adoption of a policy and practice of denying refugee

3  applications based on "not clear" SAO vetting results. Therefore, the Court does not find 8 U.S.C.

4  § 1252(a)(2)(B)(ii), which applies to decisions made to *individual* applications, applicable here to

5  this challenge of immigration policy.

6      Defendants further argue that this change is unreviewable under Section 701(a)(2) because

7  "there is no meaningful standard against which to evaluate USCIS's exercise of discretion in

8  according the appropriate weight to the FBI vetting result in adjudicating the refugee applications

9  at issue." Mot. 16-17. The Court disagrees. The legislative history for the Lautenberg Amendment

10  provides a guidepost for how to utilize discretion: "any discretion which this allows the AG to

11  deny cases is extremely limited in scope." 135 Cong. Rec. 21109 (1989). And Defendants own

12  policies give a guidepost for how to exercise discretion in a negative fashion. *See* FAC ¶ 54.

13  Accordingly, the Court finds that, for these specific reasons, in addition to the general framework

14  governing the Lautenberg-Specter Program as detailed above, there is a meaningful standard

15  against which to evaluate the change in policy and practice to deny refugees who receive "not

16  clear" vetting results.

17      **C.    Final Agency Action**

18      Defendants further argue that the challenged changes to the vetting process do not

19  constitute final agency actions and thus are not reviewable under the APA. Mot. 18-20, Reply 11-

20  14. The Court agrees with Defendants that the decision to transfer Merlin SAO vetting to the FBI

21  Terrorist Task Force is not a final agency action because no legal consequences flow from this

22  change. The Court agrees with Plaintiffs that the decision to adopt the policy and practice of

23  denying or rejecting refugee cases based on a "not clear" vetting result constitutes a final agency

24  action reviewable under the APA.

25      In the Ninth Circuit, the final agency action requirement has been treated as jurisdictional. *San*

26  *Francisco Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 571 (9th Cir. 2019); *see also*

27  *Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1161 (9th Cir. 2018), *Ukiah Valley Med. Ctr. v.*

28  *FTC*, 911 F.2d 261, 266 (9th Cir. 1990) ("'[F]inal agency action' is a jurisdictional requirement

1    imposed by [5 U.S.C. § 704].")

2         There are "two conditions that generally must be satisfied for agency action to be 'final'

3    under the APA." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016). "First,

4    the action must mark the consummation of the agency's decisionmaking [sic] process—it must not

5    be of a merely tentative or interlocutory nature." *Id.* (internal quotation marks omitted). "[S]econd,

6    the action must be one by which rights or obligations have been determined, or from which legal

7    consequences will flow." *Id.* (internal quotation marks omitted). The second prong will be

8    satisfied where the agency's action "gives rise to 'direct and appreciable legal consequences.'"

9    *Hawkes*, 136 S. Ct. at 1814 (quoting *Bennett v Spear*, 520 U.S. 154, 178 (1997)). The Court will

10   consider each challenged change separately.

### i. The Decision to Transfer SAO Vetting to the FBI Terrorist Task Force is Not Final Agency Action

12        Defendants argue that the decision to transfer SAO vetting to the FBI Terrorist Task Force

13   is not final agency action because it did not determine any "rights or obligations" and did not

14   result in any "legal consequences." Mot. 19-20. They cite this Court's prior order granting in part

15   Plaintiffs' motion to file an amended complaint to argue that legal consequences do not flow from

16   this decision. Mot. 19; *see also* Order 12:9-11, ECF 389 ("Rather, the legal consequences occur

17   once DHS decides that the FBI's 'not clear' result weighs more than all of the other information it

18   receives"). And Defendants argue that Doe 3 and 4, who were initially denied refugee admission

19   to the United States, ultimately received approval, and therefore the transfer of vetting to the FBI

20   Terrorist Task Force cannot be outcome-determinative. Mot. 19.[9]

21        Plaintiffs argue, correctly, that Doe 3 and 4 are not class representatives for the APA claim

22   because ████████████████████████████████████████████████

23   ██████ Opp'n 19. The Court disagrees with Plaintiffs, though, that legal consequences flow from

24   the decision to transfer SAO vetting to the FBI Terrorist Task Force. The transfer of SAO vetting

25

26   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

27   [9] Defendants include arguments about whether the results of the vetting process are outcome-determinative in this section. Mot. 19. However, the Court finds that these arguments are more accurately directed at the alleged policy and practice of denying or rejecting refugee cases based on a "not clear" vetting result, which is addressed below.

28

*(left margin)* United States District Court  Northern District of California

alone is not outcome-determinative. As discussed below, it is the decision regarding the weight given to those vetting results that implicates the APA. Merely choosing which sources of law enforcement data to gather and utilizing the measuring techniques embedded in that data source is not outcome-determinative. Accordingly, the Court GRANTS Defendants' motion to dismiss as to the challenged change of transferring SAO vetting to the FBI Terrorist Task Force.

### ii. The Policy and Practice of Denying or Rejecting Refugee Cases Based on a "Not Clear" Vetting Result is Final Agency Action

The Court finds that the policy and practice of denying or rejecting refugee cases based on a "not clear" vetting result is final agency action and will separately address the two required conditions for finding final agency action.

### a. Legal Consequences Flow From the Policy and Practice of Denying or Rejecting Refugee Cases Based on a "Not Clear" Vetting Result

Defendants argue that there is no policy and practice of denying or rejecting refugee cases based on a "not clear" vetting result, and Plaintiffs' argument to the contrary is mistaken. Mot. 20. Defendants cite a new declaration from Joanna Ruppel, who has been the chief of USCIS's Internal and Refugee Affairs Division since February 2018, and excerpts from her Rule 30(b)(6) deposition taken by Plaintiffs on November 7, 2019, in an attempt to show that the FBI Terrorist Task Force vetting results were not outcome-determinative. *See* Ex. 1, Decl. of Joanna Ruppel ("Ruppel Decl."), ECF 397-1; Ex. 2., Dep. of Joanna Ruppel ("Defs.' Ruppel Dep. Tr."), ECF 397-2. Ms. Ruppel states in her declaration that USCIS retains final authority to approve or deny an application. Ruppel Decl. ¶ 7. Defendants cite deposition testimony from Ms. Ruppel indicating that conversations with a vetting partner can lead to changing a vetting result from "not clear" to "clear," Defs.' Ruppel Dep. Tr. 114:16-115:22. Ms. Ruppel further states that USCIS reopened all of Plaintiffs' cases after this Court's summary judgment order, and eight refugee applicants were subsequently cleared and approved, allegedly further demonstrating that the FBI Terrorist Task Force vetting result is not outcome-determinative. Ruppel Decl. ¶¶ 10-14.

Plaintiffs argue that the new Ruppel Declaration that suggests USCIS has always had discretion to admit refugees with a "not clear" SAO vetting result contradicts prior DHS testimony and submissions and therefore should not be accepted by this Court. Decl. of Mary Margaret Stone

1  ("Stone Decl.") ¶ 10, ECF 95-1 ("USCIS will not approve a refugee application unless USCIS

2  receives a clear result from the Interagency Check and, where required, the Security Advisory

3  Opinion."); Ex. 7, Refugee Division Officer Training Course Security Checks 5, ECF 407-13 ("all

4  case members requiring an SAO "Merlin" must have unexpired cleared SAO results in order for a

5  case to be approved"); *see also* Ex. 9, Revised Guidance to RSCs on "Not Clear" SAOs, ECF 408-

6  10. Ms. Ruppel affirmed in her deposition that the Stone Declaration was "an accurate

7  representation of USCIS policy." Ex. 4, Dep. of Joanna Ruppel ("Pls.' Ruppel Dep. Tr.") 114:13-

8  15, ECF 407-8. And Ms. Ruppel herself testified that Defendants have *never* approved a refugee

9  application with a "not clear" vetting result. *Id.* 116:5-6. The Court agrees with Plaintiffs that Ms.

10 Ruppel's new declaration should not be considered because it contradicts her own prior testimony,

11 the prior declaration of another USCIS official that was affirmed by Ms. Ruppel, and prior DHS

12 and DOS submissions in this case. *See Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th

13 Cir. 1991) ("[A] party cannot create an issue of fact by an affidavit contradicting his prior

14 deposition testimony.").

15      Additionally, Ms. Ruppel further confirms that although an initial "not clear" finding can

16 be resubmitted to the FBI for reconsideration, if the FBI does not issue a "clear" finding, then the

17 application is always denied. Pls.' Ruppel Dep. Tr. 116:5-6, 22-24. And Plaintiffs also argue that,

18 in the case of the eight individuals who had their applications re-opened, the second vetting

19 process provided a "clear" result, so Plaintiffs' argument—a "not clear" SAO vetting result from

20 the FBI Terrorist Task Force is outcome-determinative—still stands as valid. Opp'n 19.

21      The Court agrees with Plaintiffs. None of Defendants' cited evidence shows that an

22 application can be approved with a "not clear" vetting result. Working with the FBI Terrorist

23 Force to produce a "clear" vetting result after a court orders the re-adjudication of applications

24 does not change that fact that there is a policy and practice of denying applications with a "not

25 clear" vetting result—a result from which legal consequences flow for the denied refugee

26 applicants. Defendants effectively acknowledge that no other information about an applicant could

27 ever be sufficient to outweigh the "not clear" finding. Therefore, the Court finds that legal

28 consequences flow from this challenged change, fulfilling one of the required conditions for final

1  agency action.

2         **iii.    The Policy and Practice of Denying or Rejection Refugee Cases Based on a**
3                     **"Not Clear" Vetting Result is the Consummation of the Agency's Decision-**
                   **Making Process**

4        Defendants argue that the policy and practice of denying or rejecting refugee cases based

5  on a "not clear" vetting result is the type of intermediate agency actions that are unreviewable

6  because it does not mark the consummation of the agency decision-making process. Reply 11-13.

7  The Court disagrees.

8        "The APA defines 'agency action' broadly to 'include the whole or a part of an agency

9  rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act.'" *San*

10  *Francisco Herring Ass'n*, 946 F.3d at 575 (quoting 5 U.S.C. § 551(13)). "This definition 'is meant

11  to cover comprehensively every manner in which an agency may exercise its power.'" *San*

12  *Francisco Herring Ass'n*, 946 F.3d at 575. (quoting *Whitman v. American Trucking Ass'ns*, 531

13  U.S. 457, 478 (2001)).

14        "An agency action can be final even if its legal or practical effects are contingent on a

15  future event." *Gill v. Dept. of Justice*, 913 F.3d 1179, 1185 (9th Cir. 2019); *see also City of*

16  *Fremont v. F.E.R.C.*, 336 F.3d 910, 914 (9th Cir. 2003) (concluding agency orders that attach

17  legal consequences to future proceedings satisfy the finality analysis). Here, Defendants again cite

18  Ms. Ruppel's deposition testimony indicating that, "if there were concerns about the information"

19  USCIS the information received from its vetting partners, the agency would talk to its vetting

20  partners about the vetting results, and those conversations could result in a "not clear" result

21  changing to "clear." Reply 13 (citing Defs.' Ruppel Dep. Tr. 114:16-115:22). However, elsewhere

22  in her deposition, Ms. Ruppel makes clear that the only information USCIS received from the FBI

23  Terrorist Task Force was the result of ████████████████████████████████

24  ████████████████████████████████████████████ Pls.' Ruppel Dep.

25  Tr. 136:7-18. On a Rule 12(b)(1) motion, it is the movant's burden to present evidence

26  demonstrating a lack of subject matter jurisdiction *Safe Air For Everyone*, 373 F.3d at 1039. The

27  Court finds that Defendants have not met that burden here. Defendants have presented the

28  hypothetical ability of USCIS to engage with the FBI Terrorist Task Force to overrule a "not

United States District Court
Northern District of California

1
2
3
4
5

clear" SAO result, but Defendants have presented no evidence to support that this happens in reality. And Defendants' arguments regarding USCIS's ability to approve an application despite a "not clear" result are contradicted by the evidence. Accordingly, the Court finds that the policy and practice of denying or rejecting refugee cases based on a "not clear" vetting result constitutes a final agency action.

6

### D.    Plaintiffs Have Stated a Claim Regarding Notice-and-Comment Rulemaking

7
8
9
10
11
12
13
14
15

Finally, Defendants argue that the challenged change to the vetting process does not require notice-and-comment rulemaking and therefore should be dismissed for failure to state a claim under Rule 12(b)(6). Mot. 20-23. Defendants argue that this change is a "general statement[] of policy," 5 U.S.C. § 553(b)(A), as it merely guides the refugee officers' authority. Mot. 20-23. Defendants also argue that the adjudicating officers have discretion to approve or deny an application, thus proving that this change is a statement of agency organization and not a rule that requires notice-and-comment rulemaking procedures. *Id.* Defendants also cite to the new Ruppel Declaration, Mot. 21, but they acknowledge it is inappropriate to consider evidence beyond the four corners of the complaint on a Rule 12(b)(6) motion in their reply brief, Reply 15.

16
17
18
19
20
21
22
23
24
25
26
27

Plaintiffs argue and have pled that the change left the agencies with no discretion. Opp'n 22, FAC ¶ 100. Taking Plaintiffs' well-pled facts as true, the Court finds that Plaintiffs have stated a claim on which relief can be granted. The Ninth Circuit has held that, to the extent that a new directive "narrowly limits administrative discretion or establishes a *binding norm* that so fills out the statutory scheme that upon application one need only determine whether a given case is within the rule's criterion, it effectively replaces agency discretion with a new binding rule of substantive law." *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1014 (9th Cir. 1987) (emphasis in original) (internal quotations and citation omitted). "Further, the exceptions to APA rulemaking must be 'narrowly construed and only reluctantly countenanced.'" *Doe v. Trump*, 288 F. Supp. 3d 1045, 1074 (W.D. Wash. 2017) (quoting *Alcaraz v. Block*, 746 F.2d 593, 612 (9th Cir. 1984)). Accordingly, the Court finds that, at this stage of the litigation, Plaintiffs have stated a valid claim that the change in vetting procedure required notice-and-comment rulemaking.

28

*United States District Court*
*Northern District of California*

23

**IV.    ORDER**

For the foregoing reasons, IT IS HEREBY ORDERED:

1. Plaintiffs have standing;

2. The challenged vetting policy changes are reviewable under the APA;

3. The decision to transfer vetting to the FBI Terrorist Task Force is not final agency action, and this claim is DISMISSED WITH PREJUDICE;

4. The challenged policy and practice of denying all refugee applications with "not clear" vetting results is final agency action; and

5. Plaintiffs have stated a claim regarding notice-and-comment rulemaking, and the motion is DENIED as to the challenged policy and practice of denying all refugee applications with "not clear" vetting results.

Defendants shall file an answer within 30 days.

Dated: March 15, 2021

BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California

24